UNTIED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JANINE HENRIQUEZ,

                *Plaintiff*,

  -against-

THE SALVATION ARMY,

                *Defendant*.
------------------------------------------------------------------X

**COMPLAINT**

**PLAINTIFF DEMANDS A JURY TRIAL**

Plaintiff Janine Henriquez, as and for her Complaint, respectfully alleges, all upon information and belief, as follows:

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C. §1332, in that Plaintiff's claims exceed the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

2. Venue is proper under 28 U.S.C §1391(b) because the events underlying this action occurred within the Southern District of New York and because the Defendant does business in this District.

## IDENTITY OF PARTIES

3. At all relevant times mentioned herein, Plaintiff Janine Henriquez ("Henriquez") is a resident of the State of New Jersey

4. At all relevant times mentioned herein, Defendant The Salvation Army ("TSA") is a New York not-for-profit corporation with headquarters in New York State that does business in the County, City and State of New York.

5. TSA is a not-for-profit organization that provides a range of services, including youth activities, recreation, individual and group counseling, religious services, emergency food, clothing and financial assistance worldwide.

## BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

6. Henriquez commenced her employment with TSA in January 2019 as a construction project manager.

7. Henriquez's duties and responsibilities in her position were to manage construction projects for the Eastern Territory of TSA from inception to completion, including traveling to different projects within the Eastern Territory, such as Puerto Rico, St. Thomas and St. Croix, directly managing two buildings, one in New York City and the other in Asbury Park, New Jersey.

8. Initially, Henriquez reported to Major Jorge Diaz ("Diaz").

9. Henriquez found her position rewarding, received positive feedback from Diaz and was excited about her future career at TSA.

10. All of that changed when, in July 2019, Major Charles Foster ("Foster") became Property Secretary, which made him the most senior individual in the Property Department and Henriquez's supervisor.

11. Foster's hostility toward Henriquez and her female colleague Linette Iacobellis ("Iacobellis"), the two women on the team who handled construction projects, was intense and aggressive right from the start.

12. Foster seemed to tolerate women only in a supportive more administrative role, such as Janice Lovell, a Project Analyst who he treated as a caretaker, allowing her to make him meals, and stated jokingly that Lovell "knows her place."

13. When it came to interacting with Henriquez and Iacobellis, who were directly involved with construction projects, Foster was hostile and oppositional to the women for no reason and showed them disdain from the moment he arrived, which was in stark contrast to how he interacted with male employees, such as challenging and interrogating Henriquez and Iacobellis about projects when he seemed to go along with the ideas and suggestions of their male counterparts very swiftly, regularly remaking that Henriquez and Iacobellis frustrated him, causing him to clench his teeth and turn bright red, stating that Henriquez and Iacobellis' tones gave him a headache.

14. In September 2019, Henriquez traveled to Puerto Rico for business, along with Foster, Adolph Orlando (Assistant Property Secretary) and Iacobellis.

15. During the business trip, Foster gave Henriquez and Iacobellis the silent treatment while engaging and interacting with Orlando and other male colleagues that were present, which made the trip extremely uncomfortable for Henriquez.

16. Upon their return to New York following the business trip, Foster continued to primarily give Henriquez the silent treatment, sometimes for weeks at a time.

17. On occasions when Foster did speak with Henriquez, he was usually disrespectful and demeaning, such as when, during a meeting, he told Henriquez to "stop mothering projects and give them over to daddy" and regularly stating that "all the problems in the world" were "Eve's fault," referring to the biblical story of Adam and Eve.

18. In October 2019, Henriquez was speaking with a male colleague on the telephone about a meeting.

19. Henriquez observed Foster standing outside the door to her office while she was on the telephone, which made her uncomfortable, and when the call ended, Foster humiliated Henriquez by stating that "if [he] did not know better and Roger was not married, [he] would thinking something was going on between the two of you," which was a degrading because it confirmed that, to Foster, if Henriquez had a cordial relationship with her male colleague, it was because of sex and not competence or respect.

20. In March/April 2020, Foster terminated Iacobellis under the guise of budget cuts because of the COVID-19 pandemic.

21. However, Iacobellis told Henriquez, that prior to her termination, she had complained to Human Resources about Foster's hostile and discriminatory conduct toward females, including towards Henriquez.

22. Henriquez then contact Human Resources Director Liz Edwards ("Edwards"), who asked Henriquez about her experiences with Foster, and Henriquez was open with Edwards about Foster's discriminatory treatment of her.

23. Edwards' response to Henriquez was that "this is just Foster's leadership style" and "although it was not ideal," Henriquez should "manage up," all of which was upsetting to Henriquez because it confirmed that nothing would be done to address Foster's discriminatory animus against women if his behavior was dismissed as poor leadership.

24. Foster continued his behavior, but Henriquez felt powerless to stop it because TSA refused to address it, and Henriquez needed her job.

25. On July 21, 2021, Henriquez received the happy news that she was pregnant.

26. In or about October 2021, Henriquez advised Foster that she was pregnant and also that she was seeing a special doctor because her pregnancy was considered "high-risk."

27. In or about October 2021, Henriquez provided a note to TSA confirming the high-risk status of her pregnancy and that, as a reasonable accommodation, she should not be required to travel more than one-hour from her home.

28. Shortly after Henriquez submitted the letter from her obstetrician, Foster assigned Henriquez to a construction project that was approximately four hours away from her home, involving a condemned site with a severe mold issue.

29. Henriquez was distressed at Foster's callous indifference to her medical condition and expressed her concerns to Jessica Sposato, Janet Ostrander and Adolph Orlando, who excused Fosters conduct as just forgetfulness.

30. Henriquez made her concerns about Fosters conduct known to TSA's leadership, including Orland, Michelle Dressler, and Janet Munn, but nothing was ever done to address them.

31. In or about January 2022, Henriquez went out on maternity leave and her baby was born on January 16, 2022.

32. Following the birth of her baby, Henriquez developed post-partum depression and post-partum anxiety to such a significant degree that she required medical care.

33. Henriquez's condition was so severe that she was not able to return to TSA on the date she expected her maternity leave to end and, on May 16, 2022, she submitted a request for a temporary leave of absence.

34. Henriquez was in contact with Human Resources Manager David Pence ("Pence") about her leave request and, although Pence assured Henriquez that TSA would be accommodating to her, he explained that her request would be at the discretion of Foster.

35. Henriquez was concerned that Foster would not be accommodating because of his history of discriminating against her and other women.

36. Shortly after submitting her request for a temporary leave of absence, on May 16, 2022, Henriquez was advised that if she did not return to work by June 20, 2022, she would be terminated.

37. While Henriquez had made progress in her recovery from post-partum depression, she still required further treatment and would not be ready to return to work only weeks after she had requested her leave.

38. On June 17, 2022, Henriquez submitted a complaint to Pence about TSA's discriminatory conduct and requested that her leave be extended until August 31, 2022 and that upon her return she be transferred to another department away from Foster where she could continue to work for TSA without a hostile work environment.

39. On July 21, 2022, Pence contacted Henriquez and advised her that her complaint of gender discrimination could not be substantiated because it was her word against Foster's word and that nothing further would be done by TSA to address her concerns.

40. Later that day, Henriquez emailed Ponce, advising him how upset she was by TSA's response and that she had retained legal counsel who would be in contact with TSA, a protected activity of which TSA was aware.

41. As her leave of absence neared its end, Henriquez was left with only the choice of returning to the same hostile environment she had experience before her maternity.

42. Henriquez realized that it would be impossible to sacrifice her physical and mental health and on August 30, 2022 Henriquez advised TSA that it had succeeded in forcing her out of her position.

43. As a result of TSA's discriminatory conduct, Henriquez has suffered the adverse effects of discrimination, which includes damages to the quality of her life, her self-esteem, self-respect and financial and emotional well-being because she was subjected to the humiliating and demeaning type of conduct described herein, all of which will continue and remain a source of humiliation, distress and financial loss to Henriquez into the future.

44. Here, TSA's conduct towards Henriquez shows that it acted with willful or wanton negligence, malice, recklessness, or a conscious disregard of Henriquez's rights, or that its unlawful actions against Henriquez were so reckless as to amount to a disregard of Henriquez's rights, so that in addition to all the damages inflicted upon Henriquez and in addition to all the measure of relief to which she may properly be entitled herein, TSA should also be required to pay punitive damages as punishment for its discriminatory conduct in order to deter it and others similarly situated from engaging in such conduct in the future.

### AS AND FOR A FIRST CAUSE OF ACTION ON BEHALF OF HENRIQUEZ AGAINST TSA FOR SEX DISCRIMINATION IN VIOLATION OF CHAPTER 18, ARTICLE OF THE NEW YORK STATE EXECUTIVE LAW §296(1)(a)

45. Henriquez repeats, realleges and incorporates in full paragraphs 1 through 44 of this Complaint as though fully set forth herein.

46. The entirety of the acts which constitute and form this Cause of Action, as set forth

above, all of which are deemed repeated and re-alleged herein as though said paragraphs were specifically set forth herein, were perpetrated upon Henriquez while she was in the course of her employment with TSA.

47. Foster's discriminatory treatment of Henriquez based on her gender was confirmed by his humiliating and demeaning remarks, including telling Henriquez to "stop mothering projects and give them over to daddy" and stating that "all the problems in the world" were "Eve's fault," as well as his similar treatment of Iacobellis, give rise to a very real inference that the true basis for TSA's treatment of Henriquez was gender discrimination.

48. TSA condoned and ratified Foster's gender discrimination by dismissing it as Foster's "leadership style" and by requiring her, following her return to work after recovering from post-partum depression, to either report to Foster or face termination, all of which forced her out of the workplace.

49. Henriquez was caused to suffer injuries resulting in emotional anguish and suffering, and has been humiliated, demeaned and otherwise intimidated and degraded because of TSA's outrageous conduct in violation of Henriquez's human rights, all of which impacted her well-being and the quality of her life.

50. The aforementioned acts of TSA constitute unlawful sex discrimination against Henriquez in violation of Chapter 18, Article 15 of the New York State Executive Law §296(1)(a) ("New York State Human Rights Law"), which provides, inter alia, that:

> It shall be an unlawful discriminatory practice: (a) For an employer . . . because of the . . . sex . . . of any individual . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

51. As a direct and proximate result of TSA's violation of the New York State Human Rights Law §296(1)(a), Henriquez was adversely affected in her employment, and did and continues to suffer in her life's normal pursuits, and she believes that the injuries inflicted upon her as a result of TSA's discriminatory conduct did and will continue to have a devastating effect upon the quality of her life and career, and will prevent her from functioning as she did prior to the conduct complained of herein, all of which Henriquez alleges to be in the amount of Two Million Dollars ($2,000,000).

52. TSA, because of its violations of the New York State Human Rights Law, is also liable to Henriquez for punitive damages pursuant to §297(9) and reasonable attorney's fees pursuant to §297(10), in addition to pre-judgment interest and costs.

53. Here, TSA's conduct towards Henriquez shows that it acted with willful or wanton negligence, or recklessness, or a conscious disregard of Henriquez's rights under the New York State Human Rights Law, or that its unlawful actions against Henriquez were so reckless as to amount to a disregard of Henriquez's rights, so that in addition to all the damages inflicted upon Henriquez and in addition to all the measure of relief to which Henriquez may properly be entitled herein, TSA should also be required to pay punitive damages as punishment for its reprehensible conduct in the further amount of Three Million Dollars ($3,000,000) in order to deter TSA and others similarly situated from such conduct in the future.

54. Henriquez, therefore, seeks judgment against TSA on this Cause of Action, including, among other things, for compensatory damages in the sum of Two Million Dollars ($2,000,000), and the additional further sum of Three Million Dollars ($3,000,000) in punitive damages, together with costs, pre-judgment interest and reasonable attorney's fees, making a total

of Five Million Dollars ($5,000,000).

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

**WHEREFORE**, Plaintiff demands judgment against Defendant on the Cause of Action in the sum of Two Million Dollars ($2,000,000) in compensatory damages and Three Million Dollars ($3,000,000) in punitive damages, for a total of Five Million Dollars ($5,000,000) plus, pre-judgment interest, the costs of this action and reasonable attorney's fees as is permitted under the law; and for such other and further relief as this Court deem just and proper.

**SCHWARTZ PERRY & HELLER LLP**
*Attorneys for Plaintiff*

By:_____
  DAVIDA S. PERRY
  BRIAN HELLER
  3 Park Avenue, Suite 2700
  New York, NY 10016
  (212) 889-6565